**LAW OFFICES OF ERIC A. SHORE**                    *Counsel for Plaintiff*
By: BRIANA L. PEARSON, ESQ.
2 Penn Center, Suite 1240
1500 Market Street
Philadelphia, PA 19102
215-944-6113
brianap@ericshore.com

## IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TANYA M. WILLIAMS** | : | **COMPLAINT** |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. |
| | : | |
| **AMERICAN HERITAGE** | : | |
| **CREDIT UNION** | : | |
| | : | |
| Defendant. | : | **JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

Plaintiff, **TANYA M. WILLIAMS**, by and through her counsel, The Law Offices of Eric

A. Shore, hereby brings this civil action against Defendants **AMERICAN HERITAGE CREDIT**

**UNION**. Upon information and belief and in support thereof, Plaintiff alleges as follows:

## INTRODUCTION

This is an action seeking damages to remedy injuries Plaintiff has suffered, and continues

to suffer, as a result of unlawful employment practices by the named Defendants against Plaintiff

in violation of Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. § 2000e, *et seq.*

("Title VII")*;* 42 U.S.C. § 1981 ("Section 1981"), and Consumer Financial Protection Act (Title

X of the Dodd-Frank Wall Street Reform and Consumer Protection Act), 12 U.S.C. §§ 5481 *et*

*seq.* ("CFPA").

## PARTIES

1.      Plaintiff **TANYA M. WILLIAMS** (hereinafter "Plaintiff" or "Plaintiff") is an African-American adult female individual and resident of the Commonwealth of Pennsylvania.

2.      Defendant AHCU, **AMERICAN HERITAGE CREDIT UNION** (hereafter "Defendant" or "AHCU") is domestic business entity organized and existing under the laws of the Commonwealth of Pennsylvania.

3.      Defendant AHCU previously existed and operated under the name American Heritage Federal Credit Union. As used in the Charge, all references to AHCU are intended to include American Heritage Federal Credit Union.

4.      At all times material, AHCU maintained and operated a principal place of business in Pennsylvania at 2060 Red Lion Road, Philadelphia, PA 19115.

5.      All events alleged herein occurred at AHCU's business address at 2060 Red Lion Road, Philadelphia, PA 19115.

6.      At all times material, Plaintiff was an "employee" of Defendant AHCU within the meaning of all applicable law.

7.      At all times material, Defendant AHCU was Plaintiff's "employer" within the meaning of all applicable law.

8.      At all relevant times, Defendant AHCU acted or failed to act through their agents, servants and employees, each of whom were acting within the course and scope of their employment.

## JURISDICTION & VENUE

9.      This Court has subject matter jurisdiction over Plaintiff's claims arising under Federal law pursuant to 28 U.S.C. §1331.

2

10.    Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and Defendants are subject to personal jurisdiction in this district.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

11.    On July 13, 2022, Plaintiff dual-filed with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") a Charge of Discrimination against Defendant AHCU. (EEOC Charge No. 530-2022-03402).

12.    On June 14, 2023, Plaintiff amended her Charge of Discrimination to include events that occurred after the submission of the initial Charge, including the termination of her employment.

13.    On April 14, 2023, Plaintiff filed a whistleblower retaliation complaint with the Occupational Safety & Health Administration (OSHA).

14.    Plaintiff's whistleblower retaliation complaint alleged retaliation under the Consumer Financial Protection Act (Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act) (12 U.S.C. §§ 5481 *et seq.*).

15.    Pursuant to 12 U.S.C. § 5567(4)(D) a Plaintiff in a whistleblower retaliation complaint has exhausted their administrative remedies if "Secretary of Labor has not issued a final order within 210 days after the date of filing of a complaint under this subsection."

16.    More than 210 days have elapsed since the filing of Plaintiff's whistleblower retaliation complaint with OSHA, and there has been no final decision of the Secretary.

17.    On August 23, 2023, the EEOC issued a Notice of Right to Sue on Plaintiff's Charge of Discrimination against Defendant AHCU, as amended (EEOC Charge No. 530-2022-03402).

18.    Plaintiff has exhausted her administrative remedies.

19.    Plaintiff's claims under the Pennsylvania Human Relations Act (PHRA) are not ripe because less than one year has elapsed since the PHRC assumed jurisdiction over Plaintiff's claims. Plaintiff intends to seek leave to amend her Complaint to add all claims under the PHRA after one year has elapsed.

## MATERIAL FACTS

20.    Plaintiff began employment with Defendant AHCU in October 1992 as a Teller.

21.    Over the next 12 years, Plaintiff worked her way up to the position of Quality Control Manager.

22.    During this time, Plaintiff began to notice that other Caucasian employees were rising through the ranks much faster than she was, despite having significantly less experience for the position to which they were being promoted.

23.    After being promoted to Quality Control Manager around December 2004, Plaintiff was not considered for a promotion for the next 14 years.

24.    During those 14 years, Plaintiff continued to witness Caucasian employees, including those Plaintiff had trained and supervised, consistently being promoted to higher level positions.

25.    Around June 2014, AHCU's then-COO, Scott McCaw, informed Plaintiff she would be receiving a raise in recognition of her being a "valued employee."

26.    At this time, Plaintiff had been employed at AHCU for 22 years, and had been stuck in the Quality Control Manager position for 10 years.

4

27.    The day after Plaintiff learned she was receiving a raise, Defendant AHCU announced that 8 Caucasian employees were being promoted to Assistant Vice President, Executive, and Management positions.

28.    Each of those employees had significantly less tenure with AHCU and less management experience than Plaintiff in their respective positions, and each had been promoted to higher level positions than Plaintiff.

29.    At all times material, all promotions to positions above the manager level were meted out on a purely discretionary basis by AHCU's executive management, including CEO Bruce Foulke.

30.    At all times material, employees could not "apply" for positions above the manager level.

31.    Following the promotion of 8 Caucasian employees with less tenure and management experience than Plaintiff, Plaintiff sent an email to Defendant's Senior VP of Human Resources, VP of Lending, and COO asking for an explanation of why she was not considered for a promotion.

32.    Plaintiff did not receive a response, but received notice that she was scheduled to meet with Defendant's CEO, Bruce Foulke.

33.    During the meeting with CEO Bruce Foulke, Plaintiff asked for an explanation as to why she was not considered for a promotion but was not given a specific answer other than being told she was the "highest paid level III manager."

34.    After being passed over for promotion in 2014 and raising her concerns about same directly to Defendant's CEO, Plaintiff remained stuck in her position for another four years as

5

Defendant continued promoting Caucasian employees with less tenure and management experience on a consistent basis.

35.     In September 2016, Chief Lending Office, John Demmler, and VP of HR, Flora Caranci, informed Plaintiff that her department was being reduced from 11 employees to 3 and a new "Lending Operations" department was being formed to absorb many of the responsibilities handled by Plaintiff's department.

36.     Defendant hired a new employee, Kenneth Lawrence, to oversee many areas previously handled by Plaintiff's department, including insurance, titles, credit disputes, mortgage recording and satisfaction, and lending support.

37.     The eight (8) employees previously in Plaintiff's department were reassigned to work in the newly formed Lending Operations department.

38.     Plaintiff was given a new job description however salary remained the same.

39.     Plaintiff was also asked to vacate her office and assigned to work in an open room with the remaining 3 employees in her department.

40.     Defendant's actions to strip Plaintiff's department of responsibilities it had been successfully handling for years are part of Defendant's concerted effort to prevent Plaintiff from advancing in her career.

41.     A year later, in September 2017, Plaintiff was informed in a meeting with former VP of HR Flora Caranci, former COO Scott McCaw and CEO Bruce Foulke that Kenneth Lawrence had been terminated and John Demmler had been demoted, and Plaintiff would be reassuming all of the responsibilities she previously held as QC Manger.

42.     At the time Defendant reassigned the duties, Mary Lou Denzler and Shawn McGee both were promoted to manager level positions in their respective departments.

6

43. Even though Plaintiff reassumed the duties of the ill-fated Lending Operations department, Plaintiff received no promotion, and her salary remained the same.

44. In 2018, during Plaintiff annual review period, Plaintiff spoke with CLO, Scott McKim, the fact that her Plaintiff position was not considered an AVP/VP position even though her department had expanded to a level exceeding other departments headed by AVP/VP-level employees.

45. Only after Plaintiff raised the issue, CLO Scott McKim agreed to have Plaintiff's job description revaluated, and, as a result, Plaintiff position was changed to AVP of Quality Control.

46. Around 2019, Defendant made the decision to switch insurance carriers without any input from Plaintiff's department who had overseen insurance for years.

47. When the switch occurred, VP of Lending, Brian Eichenbaum took action to strip lead responsibility for managing AHCU's insurance coverage from Plaintiff's department and reassign it to be handled by Mary Lou Denzler.

48. Plaintiff continued reporting to CLO Scott McKim until McKim's departure in 2019.

49. Around 2020, VP of Lending, Brian Eichenbaum, became Plaintiff's direct supervisor.

50. Around January 2021, Plaintiff submitted an application to become a member of Defendant's Diversity, Equity, and Inclusion (DEI) committee.

51. A few weeks later, on January 21, 2021, Plaintiff receive a letter from CEO Bruce Foulke summarily informing her that she had not been selected for a spot on the DEI committee and could apply again in two years.

52.    Around March 22, 2021, Plaintiff submitted a written letter to Bruce Foulke (CEO), Kristine Belser (Senior VP of Human Resources), Brian Hahn (COO), and Bryan Eichenbaum (Senior VP Consumer Lending & Plaintiff' direct supervisor) raising specific concerns with racially disparate treatment in Defendant's promotions.

53.    Around a month later, Kristine Belser responded with a "response" to Plaintiff's letter of concern categorically denying that discrimination played any role in promotions and effectively dismissing Plaintiff's concerns.

54.    Around November 2021, Clare Pfeil was promoted to Vice President of Electronic Funds Services.

55.    Once again, Plaintiff was not considered for a promotion to Vice President even though Plaintiff had led a much larger department with more employees and responsibilities.

56.    Around February 2022 Plaintiff noticed that material changes to her job description were made without her knowledge and without any notification to her.

57.    Around March 4, 2022, Plaintiff sent an email to Bruce Foulke (CEO), Kristine Belser (Senior VP of Human Resources), Brian Hahn (COO), and Bryan Eichenbaum (Senior VP Consumer Lending & Plaintiff' direct supervisor) raising concerns about race discrimination in promotional opportunities career advancement, as well as numerous acts of retaliation she had experienced since formally reporting discrimination a year earlier.

58.    On July 13, 2022, Plaintiff dual-filed a Charge of Discrimination with the EEOC.

59.    On July 14, 2022, Plaintiff emailed Bruce Foulke (CEO), Kristine Belser (Senior VP of Human Resources), Brian Hahn (COO), and Bryan Eichenbaum (Senior VP Consumer Lending & Plaintiff' direct supervisor) to specifically inform them that she filed a Charge of Discrimination with the EEOC.

60.    Beginning shortly after Plaintiff filed a Charge of Discrimination and informed her employer of same, AHCU began a campaign of retaliation intended to undermine her authority and systematically strip her of her job duties one by one until she was terminated on February 3, 2023.

61.    Around September 12, 2022, Eichenbaum took action to exclude Plaintiff from a credit reporting dispute project that Plaintiff had been in charge of handling since 2020.

62.    Without informing Plaintiff, Bryan Eichenbaum delegated responsibility for the project to another one of his direct reports.

63.    More specifically, Eichenbaum scheduled key meetings related to the project while Plaintiff was on vacation and ultimately voted to close the original project all together – all without telling Plaintiff.

64.    In September 2022, Eichenbaum sent an email criticizing Plaintiff for the delayed implementation of the Palinode project and falsely stated that he had met with Plaintiff multiple times about the issue.

65.    Eichenbaum's email was intended to serve as a pretext to criticize Plaintiff's performance even though Eichenbaum had never mentioned any issues with the Palinode project over the months since it began.

66.    On a daily basis Plaintiff' department, Quality Control, reviews the mortgage record to confirm all mortgage liens are recorded.

67.    Around October 2022, Plaintiff' department conducted an audit of mortgage recording and discovered that a significant number of mortgages had not been sent for recording as they had in the past.

68.    Only after her team inquired, it was discovered that the entire process had been changed without informing Plaintiff or anyone else on her team.

69.    When Plaintiff asked about the reason for the change, Stephanie Whittaker (Quality Control Assistant Manager) and Sindi Aleski (Quality Control Audit Supervisor) told her it was because of errors in recording for out-of-state mortgages.

70.    Those errors, however, would have been avoided if Plaintiff' department was not excluded from the process in the first place.

71.    Around October 12, 2022, AHCU's counsel submitted a Position Statement to the EEOC in response to Plaintiff' July 2022 EEOC Charge.

72.    Around November 25, 2022, Plaintiff emailed Bryan Eichenbaum, Kristine Belser, and Brian Hahn to notify them of a series of retaliatory acts against her that had transpired since she filed her original EEOC Charge on July 22, 2022.

73.    No one from AHCU took action to address her concerns of retaliation or protect Plaintiff from further retaliation. In fact, the retaliation only got worse.

74.    Beginning around December 2022, Bryan Eichenbaum began canceling or rescheduling just about every meeting with Plaintiff to discuss work-related matters.

75.    Plaintiff' annual performance review was canceled multiple times after being originally scheduled for December 23, 2022.

76.    Ordinarily, Plaintiff' supervisor would send her the performance appraisal weeks in advance of the meeting so she could review it and add comments before the meeting.

77.    However, her 2022 performance appraisal was not released to her until the Friday before the meeting was scheduled for January 9, 2023.

78.     It was released only after Plaintiff sent an email on January 5, 2023, to Bryan Eichenbaum reporting to him that she felt that the constant rescheduling of her performance review meeting was retaliatory and clearly connected to her charge of discrimination filed in July 2022.

79.     For the last 22 years, Plaintiff was responsible for oversight and compliance with federal law, including the mortgage lending data submitted to the Consumer Finance Protection Bureau (CFPB) pursuant to the Home Mortgage Disclosure Act (HMDA).

80.     On January 7, 2023, Plaintiff sent an email to senior management employees at AHCU explaining that there were disparities in the HMDA lending data suggesting that mortgage lending to people of color was significantly lower than white people.

81.     AHCU's senior management included on Plaintiff' January 7, 2023, email were:

   a. Bryan Eichenbaum – Senior Vice President Consumer Lending / Plaintiff's Direct Supervisor
   b. William Mello - Vice President Commercial Lending
   c. John Giordano – Vice President First Heritage Financial
   d. Brian Hahn – Chief Operating Officer

82.     Plaintiff was required to submit the HMDA data to the CFPB on March 1, 2023.

83.     Plaintiff specifically requested to meet with AHCU's management to discuss the disparities and a plan to increase the number of applications received or originated from people of color.

84.     Plaintiff sent the email to AHCU's management on January 7, 2023, because she reasonably believed AHCU's lending practices, as evidenced by the HMDA data, were discriminatory and violated federal laws, including the:

   a. Consumer Financial Protection Act (Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act) (12 U.S.C. §§ 5481 *et seq.*)
   b. Home Mortgage Disclosure Act of 1975 (12 U.S.C. §§ 2801 *et seq.*)

11

c.  Equal Credit Opportunity Act (15 U.S.C. §§ 1691 *et seq.*)

d.  Fair Housing Act (42. U.S.C. §§ 3601 *et seq.*)

85.     It is alleged, upon information and belief, that AHCU engaged in unlawful discriminatory lending practices including locating and maintaining nearly all its offices and all its loan officers in majority-white neighborhoods and avoiding having offices in—or having loan officers serve—majority-minority areas.

86.     AHCU also concentrated its outreach, advertising, and marketing in majority-white neighborhoods and avoided marketing to majority-minority areas. As a result of these practices, AHCU discouraged applicants and prospective applicants, generating disproportionately low numbers of loan applications and home loans from majority-minority neighborhoods in the Philadelphia MSA compared to similarly situated lenders.

87.     On January 9, 2023, Plaintiff met with her supervisor, Bryan Eichenbaum, to discuss her annual performance review.

88.     While, on paper, the review was superficially positive and resulted in a pay increase, Bryan Eichenbaum's comments to Plaintiff about the areas for improvement were all related to aspects of Plaintiff's job that Eichenbaum had actively undermined during the preceding year.

89.     Moreover, the overall rating of "meets expectations" would necessarily limit Plaintiff's ability to seek promotional opportunities in the future.

90.     At all times material prior to her performance review meeting, neither Eichenbaum nor anyone else at AHCU said anything to Plaintiff about the "areas for improvement" or any other deficiencies in her work performance. Indeed, Plaintiff' work performance was exemplary throughout the 30 years she worked for AHCU.

91.     During the meeting, Plaintiff told Bryan Eichenbaum, in words or substance, that she believed his actions over the last six months since she filed her EEOC Charge were retaliatory and clearly intended to redistribute her job responsibilities to other people in anticipation of terminating Plaintiff employment.

92.     Additionally, during the performance review meeting, Eichenbaum told Plaintiff that she should not have sent the January 7, 2023, email to AHCU's management without discussing it with him first. Eichenbaum specifically told Plaintiff that she was not allowed to discuss the HMDA data with anyone at AHCU besides Eichenbaum and William Mello.

93.     Eichenbaum then asked Plaintiff "what the problem is" with the HMDA data at which time Plaintiff explained that she believed AHCU was systematically excluding people of color from mortgage lending by maintaining nearly all its offices and all its loan officers in majority-white neighborhoods and avoiding marketing to majority-minority areas.

94.     For example, AHCU decided not to reopen branch offices in two majority-minority neighborhoods in Philadelphia after the COVID-19 pandemic because they were not profitable.

95.     As a result, nearly all AHCU's branch offices were located in majority-white neighborhoods in Philadelphia.

96.     Eichenbaum dismissed Plaintiff's concerns about discriminatory lending practices by telling Plaintiff, in words or substance, "that's above your pay grade."

97.     Following the January 9, 2023, performance review meeting, no one from AHCU mentioned or took any action on the issues raised in Plaintiff' January 7, 2023, email.

98.     On January 10, 2023, Plaintiff submitted a whistleblower complaint to the Consumer Financial Protection Board reporting what she reasonably believed to be unlawful discriminatory mortgage lending practices by AHCU.

99.    Plaintiff's actions to raise complaints about discriminatory lending practices directly to her employer and subsequently in a whistleblower complaint to the CFPB are protected activity under the relevant laws enforced by OSHA.

100.    On January 10, 2023, Plaintiff received an email from Kristine Belser accusing Plaintiff of speaking to Bryan Eichenbaum in a "disdainful, unprofessional and disrespectful manner" while characterizing Eichenbaum's actions as "courteous and professional."

101.    Kristine Belser was not a party to the meeting and had no idea what either Plaintiff or Bryan Eichenbaum said.

102.    Moreover, Kristine Belser never asked Plaintiff for her side of the story before accusing her of "disdainful, unprofessional and disrespectful" behavior.

103.    Kristine Belser ended the email by stating "we consider this performance review matter now closed and again expect you to work to the best of your ability reporting to Bryan and to contribute to our team in a positive manner going forward."

104.    The message to Plaintiff was clear: "*you better stop complaining, or else.*"

105.    On January 18, 2023, Plaintiff was notified by an employee in her department that the Home Mortgage Disclosure Act (HMDA) data was "missing" and could no longer be accessed even though it was Plaintiff' job responsibility to compile, review, and submit the data to the CFPB each year.

106.    On January 25, 2023, Eichenbaum called Plaintiff into a meeting and summarily told Plaintiff that the Quality Control department would not be permitted to take over the check processing process even though the change had originally been suggested by Amy Anderson with approval from Maryellen Rosengarten because they believed Plaintiff's department was best suited to handle the process.

14

107.    On January 30, 2023, Plaintiff attempted to log into her computer terminal but received a notification that she was locked out of her computer and had to contact IT to regain access.

108.    Also on January 30, 2023, Fawn Martin contacted Plaintiff to advise that she was going to reschedule the Mid-Managers' Meeting that Plaintiff was set to lead on February 14, 2023.

109.    On February 3, 2023, after 30 years of employment with AHCU, Plaintiff was called into a meeting with Belser and Eichenbaum and unceremoniously presented a letter terminating her employment.

110.    The stated reason for Plaintiff's termination was that "your conduct and behavior has caused significant disruption and risk to business operations, has interfered with management prerogatives, and is creating a hostile work environment."

111.    However, AHCU's stated basis for Plaintiff' termination is pretext to a termination unlawfully motivated by Plaintiff' race, color, and/or an intent to retaliate against Plaintiff for her protected activity.

112.    Indeed, Plaintiff's only actions in the months leading up to her termination were to oppose AHCU's discriminatory employment practices, file a Charge of Discrimination with the EEOC, and report potentially discriminatory lending practices by AHCU.

113.    Plaintiff claims that her race and/or protected activity were the motivating and/or determinative factors in Defendant AHCU's actions to terminate Plaintiff's employment.

114.    Defendant AHCU's actions to terminate Plaintiff were done under circumstances sufficient to raise an inference of discrimination and/or retaliation.

115.    The above are just some of the examples of unlawful discrimination and retaliation to which Defendant AHCU subjected the Plaintiff on the basis of her race, and/or Plaintiff's protected activity.

116.    Plaintiff claims that some or all of the discriminatory and retaliatory set forth in this Charge was intentional and unlawfully based on Plaintiff's race, and/or Plaintiff's protected activity.

117.    Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

118.    At all times material, Plaintiff acted under a reasonable, good-faith belief that Defendant AHCU's actions violated Plaintiff's legally protected right to be free from discrimination and retaliation in the workplace.

119.    At all times material, Plaintiff opposed the discriminatory and retaliatory conduct set forth in this Charge and made good-faith efforts to take corrective action through the channels available to her as an employee of Defendant AHCU.

120.    Plaintiff claims that Defendant AHCU's actions as alleged in this Complaint, created an unlawful hostile work environment based on Plaintiff, race, color, and/or protected activity.

121.    Plaintiff claims that the unlawful hostile work environment culminated in the termination of her employment on February 3, 2023.

122.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other

16

nonpecuniary losses. Plaintiff has further experienced severe emotional and physical distress and aggravation, activation, and/or exacerbation of any preexisting condition.

123. In the event Defendant AHCU claims or a Court determines that Plaintiff is an Independent Contractor, Plaintiff makes all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors. Furthermore, in such case, Plaintiff claims that Defendant AHCU owed and breach its duty to Plaintiff to prevent the harassment/discrimination/retaliation and is liable therefore for negligence.

<u>**COUNT I**</u>
**Disparate Treatment in Violation of**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,** *et seq.*
*(Plaintiff v. Defendant)*

124. Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

125. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 provides in relevant part: "It shall be unlawful employment practice for an employer (1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

126. Title VII further provides that "un unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a

17

motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

127.    Defendant engaged in unlawful employment practices prohibited by Title VII by intentionally discriminating against Plaintiff with respect to her compensation, terms, conditions, training and privileges of employment because of her race and/or color.

128.    Defendant subjected Plaintiff to adverse tangible employment actions, including but not limited to, the termination of Plaintiff's employment on February 3, 2023.

129.    Plaintiff's protected characteristics (race and color) were determinative factors in the Defendant's decisions.

130.    Defendant cannot show any legitimate nondiscriminatory reasons for its employment practices and any reasons proffered by Defendant for its actions against Plaintiff are pretextual.

131.    Alternatively, Plaintiff's protected status played a motivating part in the Defendant's decisions even if other factors may also have motivated its actions against Plaintiff.

132.    Defendant acted with the intent to discriminate.

133.    Defendant acted upon a continuing course of conduct.

134.    As a result of the Defendant's violations of Title VII, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**COUNT II**
**Hostile Work Environment In Violation of**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,** *et seq*
**(*Plaintiff v. Defendant*)**

135.    Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

136.    Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 provides in relevant part: "It shall be unlawful employment practice for an employer (1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

137.    Title VII also prohibits hostile work environment harassment, defined as unwanted comments or conduct regarding the Plaintiff's protected characteristics that have the purpose or effect of unreasonably interfering with the terms and conditions of the Plaintiff's employment. *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993).

138.    Retaliatory hostile work environment claims are cognizable under Title VII. *See Komis v. Sec'y of United States Dep't of Lab.,* 918 F.3d 289, 293 (3d Cir. 2019).

139.    Defendant AHCU, by and through its agent and employees, intentionally discriminated against Plaintiff in the terms and conditions of her employment on the basis of Plaintiff's race and/or color.

140.    As alleged herein, Defendant subjected Plaintiff to materially adverse employment actions in retaliation for Plaintiff's protected activity.

141. At all times material, Defendant's intentional, discrimination and retaliation was not welcomed by Plaintiff.

142. At all times material, the intentional discrimination and retaliation by Defendant was so severe or pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile or abusive.

143. At all times material, Plaintiff believed her work environment to be hostile or abusive as a result of Defendant's discriminatory and retaliatory conduct.

144. The hostile work environment alleged herein unreasonably interfered with Plaintiff's work performance.

145. The hostile work environment alleged herein was so extreme that it resulted in material changes to the terms and conditions of Plaintiff's employment.

146. The hostile work environment alleged herein culminated in the termination of Plaintiff's employment on February 3, 2023.

147. Defendant provided a futile avenue for complaint.

148. Defendant retaliated against Plaintiff for her complaints.

149. Defendant acted upon a continuing course of conduct.

150. Defendant's unlawful actions towards Plaintiff were intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

151. As a result of Defendant's violations of Title VII, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**COUNT III**
**Unlawful Retaliation in Violation of**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,** *et seq.*
*(Plaintiff v. Defendant)*

152.    Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

153.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be an unlawful employment practice for an employer "(1) to . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

154.    As alleged herein, Plaintiff engaged in protected activity under Title VII including, but not limited to raising formal and informal complaints opposing Defendant's discriminatory employment practices.

155.    At all times material, Plaintiff acted under a good faith belief that her right to be free from unlawful discrimination in the workplace was violated.

156.    Plaintiff was subjected to materially adverse actions at the time or after the protected conduct took place.

157.    Plaintiff's protected activity was the motivating and/or determinative factor in Defendant's decision to take materially adverse action against Plaintiff.

158.    Plaintiff's protected activity was the but-for cause of Defendant's decision to take materially adverse action against Plaintiff.

159.    Defendant acted upon a continuing course of conduct.

160.    Defendant's unlawful actions towards Plaintiff were intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

161.     Defendant's decisions to take materially adverse action against Plaintiff in retaliation for Plaintiff's prior protected activity is an unlawful employment practice in violation of Title VII of the Civil Rights Act of 1964.

162.     As a result of Defendant's violations of Title VII, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**COUNT IV**
**Unlawful Race Discrimination**
**in Violation of 42 U.S.C § 1981**
***(Plaintiff v. Defendant)***

163.     Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

164.     42 U.S.C § 1981 provides, in pertinent part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

165.     Section 1981's prohibition against racial discrimination in the making and enforcement of contracts provides a cause of action to remedy race discrimination in the employment context.

166.     At all times material, Plaintiff and Defendant were in an employment relationship entitled to the protections of 42 U.S.C. § 1981.

167.     At all times material, Plaintiff's race was and is African American/Black.

168.    At all times material, Defendant had knowledge of Plaintiff's race.

169.    Defendants violated Section 1981 by intentionally discriminating against Plaintiff in a serious tangible way with respect to her compensation, terms, conditions, or privileges of employment.

170.    Plaintiff's race was a determinative or motivating factor in Defendant's employment actions.

171.    Defendants cannot show any legitimate nondiscriminatory reason for their employment practices and any reasons proffered by the Defendants for their actions against Plaintiff are pretextual and can readily be disbelieved.

172.    Plaintiff's protected status played a motivating part in the Defendant's decisions even if other factors may also have motivated Defendants' actions against Plaintiff.

173.    Defendant acted with the intent to discriminate.

174.    Defendant acted upon a continuing course of conduct.

175.    Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights and as a result there should be an award of punitive damages against Defendant.

176.    Defendant's unlawful actions towards Plaintiff were intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

177.    As a result of Defendant's violations of Section 1981, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**COUNT V**
**Racially Hostile Work Environment**
**In Violation of 42 U.S.C. § 1981**
*(Plaintiff v. Defendant)*

178.    Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

179.    42 U.S.C § 1981 provides, in pertinent part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

180.    Section 1981's prohibition against racial discrimination in the making and enforcement of contracts provides a cause of action to remedy race discrimination in the employment context.

181.    The Third Circuit has recognized that § 1981 provides a cause of action for hostile work environment and the standards for a hostile work environment clam are identical under Title VII and § 1981. *See, e.g., Ocasio v. Leigh Valley Family Health Center,* 92 Fed. Appx 876, 879-80 (3d Cir. 2004) ("As amended by the 1991 Civil Rights Act, § 1981 now encompasses hostile work environment claims, and we apply the same standards as in a similar Title VII claim.").

182.    At all times material, Plaintiff and Defendant were in an employment relationship entitled to the protections of 42 U.S.C. § 1981.

183.    At all times material, Plaintiff's race was and is African American/Black.

184.    At all times material, Defendant had knowledge of Plaintiff's race.

185.   Defendant, by and through its agents and employees, intentionally discriminated against Plaintiff in the terms and conditions of her employment on the basis of Plaintiff's race and/or color.

186.   At all times material, Defendant's intentional, racially motivated discrimination was not welcomed by Plaintiff.

187.   At all times material, the intentional, race-based discrimination by Defendant was so severe or pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile or abusive.

188.   At all times material, Plaintiff believed her work environment to be hostile or abusive as a result of Defendant's racially discriminatory conduct.

189.   The hostile work environment alleged herein unreasonably interfered with Plaintiff's work performance.

190.   The hostile work environment alleged herein was so extreme that it resulted in material changes to the terms and conditions of Plaintiff's employment.

191.   The hostile work environment alleged herein culminated in the termination of Plaintiff's employment on February 3, 2023.

192.   Defendant provided a futile avenue for complaint.

193.   Defendant retaliated against Plaintiff for her complaints.

194.   Defendant acted upon a continuing course of conduct.

195.   Defendant's unlawful actions towards Plaintiff were intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

196.   Defendant failed to exercise reasonable care to prevent racial harassment in the workplace by failing to establish an explicit policy against harassment in the workplace on the

25

basis of race, failing to fully communicate the policy to its employees, failing to provide a reasonable way for Plaintiff to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by Plaintiff.

197.    Defendants acted upon a continuing course of conduct.

198.    As a result of Defendant's violations of Section 1981, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**COUNT VI**
**Unlawful Retaliation**
**In Violation of 42 U.S.C. § 1981**
***(Plaintiff v. Defendant)***

199.    Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

200.    The United States Supreme Court has held that retaliation claims are cognizable under § 1981. *CBOCS West, Inc. v. Humphries,* 553 U.S. 442 (2008).

201.    As alleged herein, Plaintiff engaged in protected activity under Section 1981 including, but not limited to raising formal and informal complaints opposing Defendant's discriminatory employment practices.

202.    At all times material, Plaintiff acted under a good faith belief that her right to be free from unlawful discrimination in the workplace was violated.

203.    Plaintiff was subjected to materially adverse actions at the time or after the protected conduct took place.

204.    Plaintiff's protected activity was the motivating and/or determinative factor in the Defendant's decision to take materially adverse action against Plaintiff.

205.    Plaintiff's protected activity was the but-for cause of Defendant's decision to take materially adverse action against Plaintiff.

206.    Defendant acted upon a continuing course of conduct.

207.    Defendant's unlawful actions towards Plaintiff were intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

208.    Defendant's action to take materially adverse action against Plaintiff in retaliation for Plaintiff's prior protected activity is an unlawful employment practice in violation of Section 1981.

209.    As a result of the Defendant's violations of Section 1981, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

## COUNT VII
**Unlawful Retaliation**
**in Violation of the Consumer Financial Protection Act, 12 U.S.C. § 5567**
*(Plaintiff v. Defendant)*

210.    Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

211.    12 U.S.C. § 5567(a) provides, in pertinent part,

No covered person or service provider shall terminate or in any other way discriminate against, or cause to be terminated or discriminated against, any covered employee or any authorized representative of covered employees by reason of the fact that such employee or representative, whether at the initiative of the employee or in the

27

ordinary course of the duties of the employee (or any person acting pursuant to a request of the employee), has—

(1) provided, caused to be provided, or is about to provide or cause to be provided, information to the employer, the Bureau, or any other State, local, or Federal, government authority or law enforcement agency relating to any violation of, or any act or omission that the employee reasonably believes to be a violation of, any provision of this title [1] or any other provision of law that is subject to the jurisdiction of the Bureau, or any rule, order, standard, or prohibition prescribed by the Bureau;

(2) testified or will testify in any proceeding resulting from the administration or enforcement of any provision of this title 1 or any other provision of law that is subject to the jurisdiction of the Bureau, or any rule, order, standard, or prohibition prescribed by the Bureau;

(3) filed, instituted, or caused to be filed or instituted any proceeding under any Federal consumer financial law; or

(4) objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed to be in violation of any law, rule, order, standard, or prohibition, subject to the jurisdiction of, or enforceable by, the Bureau.

212.    At all times material, Plaintiff was an employee covered by 12 U.S.C. § 5567.

213.    As alleged herein, Plaintiff engaged in protected activity within the scope of 12 U.S.C. § 5567.

214.    At all times material, Plaintiff reasonably believed Defendant's lending practices, as evidenced by the HMDA data, were discriminatory and violated federal laws, including the:

   a. Consumer Financial Protection Act (Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act) (12 U.S.C. §§ 5481 *et seq.*)

   b. Home Mortgage Disclosure Act of 1975 (12 U.S.C. §§ 2801 *et seq.*)

   c. Equal Credit Opportunity Act (15 U.S.C. §§ 1691 *et seq.*)

   d. Fair Housing Act (42. U.S.C. §§ 3601 *et seq.*)

215.    Plaintiff was subjected to materially adverse actions at the time or after the protected conduct took place.

216. Plaintiff's protected activity was the motivating and/or determinative factor in the Defendant's decision to take materially adverse action against Plaintiff.

217. Plaintiff's protected activity was the but-for cause of Defendant's decision to take materially adverse action against Plaintiff.

218. Defendant acted upon a continuing course of conduct.

219. Defendant's unlawful actions towards Plaintiff were intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

220. Defendant's action to take materially adverse action against Plaintiff in retaliation for Plaintiff's prior protected activity is an unlawful employment practice in violation of 12 U.S.C. § 5567.

221. As a result of the Defendant's violations of 12 U.S.C. § 5567, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against the named Defendants, in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress and back pay and front pay, punitive damages, statutory damages, attorneys' fees, costs, interest, and disbursements of action; and for such other relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

29

Dated: November 20, 2023                    **LAW OFFICES OF ERIC A. SHORE**

                                            */s/ Briana L. Pearson*
                                            **BRIANA L. PEARSON, ESQ.**
                                            2 Penn Center, Suite 1240
                                            1500 Market Street
                                            Philadelphia, PA 19102
                                            215-944-6113
                                            brianap@ericshore.com
                                            *Attorney for Plaintiff*

30